# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY and WILD FISH CONSERVANCY, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF THE NAVY; B.J. PENN, in his official capacity as Acting Secretary of the Navy; U.S. FISH AND WILDLIFE SERVICE; KEN SALAZAR, in his official capacity as Secretary of the Interior; NATIONAL MARINE FISHERIES SERVICE; and OTTO J. WOLFF, in his official capacity as Acting Secretary of Commerce, <br><br> Defendants. | CASE NO. C08-5552BHS <br><br> ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS AND STAYING ACTION |

This matter comes before the Court on Defendants' motion to dismiss. Dkt. 24. The Court has considered the pleadings filed in support and in opposition to Defendants' motion and the remainder of the record, and hereby grants the motion in part, and stays the remainder of this action, for the reasons stated herein.

This case involves a challenge to the United States Department of the Navy's ("Navy") Explosive Ordnance Disposal ("EOD") underwater training exercises in Puget Sound, Washington. Plaintiffs Public Employees for Environmental Responsibility and Wild Fish Conservancy ("PEER") challenge the Navy's EOD exercises, alleging

ORDER - 1

violations of the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedure Act ("APA").

Defendants now move to dismiss Plaintiffs' claims for lack of subject-matter jurisdiction, contending that the claims are moot.

## I. STATUTORY AND REGULATORY BACKGROUND

### A. NATIONAL ENVIRONMENTAL POLICY ACT

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). All federal agencies must also study, develop, and describe appropriate alternatives to the recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. *Id*. § 4332(2)(E).

The Council on Environmental Quality's ("CEQ") regulations implementing NEPA require that "environmental information . . . [be] made available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). If the proposed action is one which does not normally require an EIS, an agency may prepare an environmental assessment in order to determine whether an EIS is required. *Id*. § 1501.4; *id.* § 1508.9. If the agency determines, on the basis of the environmental assessment, not to prepare an EIS, it must prepare a "finding of no significant impact" and make it available to the public. *Id*. § 1504.4(e); *id*. § 1508.13.

If an agency does prepare an EIS, the agency typically prepares a draft EIS, followed by a comment period, and then prepares a final EIS. After the final EIS is

completed, the agency must issue a "record of decision" ("ROD") describing the decision, identifying all alternatives considered and the factors that were balanced in making the decision, and stating whether all practicable means to avoid or minimize harm to the environment were adopted, and if not, why not. *Id.* 1505.2. Until the ROD is issued, the agency may not take any action that would have an adverse environmental impact or limit the choice of reasonable alternatives. *Id.* 1506.1(a).

Judicial review of agency decisions is implied under NEPA. *See Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971). "It is [CEQ]'s intention that judicial review of agency compliance with [CEQ] regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury." 40 C.F.R. § 1500.3.

**B.     ENDANGERED SPECIES ACT**

The ESA contains both substantive and procedural requirements designed to carry out the goal of conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). The Secretary of the Interior is responsible for listed terrestrial and inland fish species and administers his responsibilities through the Fish and Wildlife Service ("FWS"). *Id.* §§ 1532(15) and 1533. The Secretary of Commerce has responsibility for listed marine species and administers ESA through the National Marine Fisheries Service ("NMFS").

Section 9 of ESA prohibits the "take" of members of a listed species, which means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1538(a)(1)(B). Section 7(a)(2) directs an acting agency proposing an action that may affect listed species to consult with NMFS or FWS (the "consulting agency"). *Id.* § 1536(a)(2). If an acting agency determines that the proposed action is not likely to affect protected species, and the consulting agencies provide written concurrence with this

determination, the ESA consultation process is terminated. 50 C.F.R. § 402.13(a). If written concurrence is not obtained, the agency must engage in formal consultation. *See id.* § 402.14. At the conclusion of formal consultation, the consulting agency issues a biological opinion as to whether the proposed action is likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(b); 50 C.F.R. § 402.14(h). If the proposed action is not likely to result in jeopardy but may result in the incidental "take" of members of a listed species, the biological opinion must include an incidental take statement specifying reasonable and prudent measures to minimize the take and mandatory terms and conditions to implement the reasonable and prudent measures. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Any take in compliance with the terms and conditions of an incidental take statement "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. 1536(o)(2).

Section 11 of ESA provides that "any person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). No action may be commenced "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." *Id.* § 1540(g)(2)(A)(i).

Challenges to actions of a consulting agency are brought under the APA, and not the ESA citizen suit provision. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

**C.     ADMINISTRATIVE PROCEDURE ACT**

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where no other statute provides a right of action, the "agency action" complained of must be "final agency action." *Id.* § 704. In cases

ORDER - 4

involving an alleged "failure to act," the APA authorizes suit to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## II. FACTUAL BACKGROUND

At least since the 1980s, the Navy has conducted EOD exercises in the Navy Region Northwest in Puget Sound, Washington at three locations: Crescent Harbor (Whidbey Island), Hood Canal (Floral Point), and Port Townsend Bay (Indian Island). The EOD training operations are designed to train and certify divers to dispose of underwater explosives. The EOD underwater training exercises are of two types: underwater detonations and surface or floating mine detonations. Dkt. 24 at 8. In general, each underwater exercise involves placing an inert "dummy" mine on the sea floor, locating the mine with a SCUBA diver hand-held sonar, placing a charge near the mine, attaching detonation equipment, detonating the charge, retrieving the debris, and conducting in-water inspection of the detonation site. *Id*. For surface or floating mine exercises, two swimmers attach a charge to a mine simulated by a 55-gallon metal drum floating on the surface of the water. *Id*.

According to PEER, several threatened and endangered species are found in the EOD training areas, including bull trout, chinook salmon, chum salmon, stellar sea lions, humpback whales, and marbled murrelets.

Each EOD exercise results in killing thousands of fish. A biological opinion issued by the NMFS concluded that these exercises result in the annual "take" of ESA-listed species consisting of 5,094 juvenile and 50 adult Puget Sound Chinook salmon, 1,022 juvenile and 101 adult Hood Canal summer run chum salmon, and 182 juvenile and 20 adult Puget Sound steelhead. Dkt. 18-2 at 60 (Incidental Take Statement). A biological opinion issued by FWS concluded that there is also "take" of endangered bull trout and marbled murrelets. Dkt. 18-4, 139-14 (Incidental Take Statement).

Three EOD units perform or have performed EOD training events in the Navy Region Northwest: EOD Mobile Unit Eleven ("MU-Eleven") and two shore detachments,

EOD Detachment Northwest and EOD Detachment Bangor. Dkt. 24-2 at 4. Historically, MU-Eleven has performed the majority of EOD underwater training events in the Navy Region Northwest. The training consists of using explosive charges to destroy or disable inert mines. In the past, EOD training exercises entailed as many as three to five exercises per month. According to the Navy, MU-Eleven has conducted approximately 12 to 16 EOD training exercises over the last two years, and EOD shore detachments have conducted four over the same time period. Dkt. 24, 8-9.

**A. NAVY'S DECISION TO RELOCATE MU-ELEVEN AND SUSPEND EOD EXERCISES**

On April 21, 2008, the Navy issued a directive providing for the relocation of MU-Eleven to Imperial Beach, California, effective June 1, 2010. Dkt. 24-3.

On April 30, 2009, Rear Admiral ("RDML") James Symonds, Commander of Navy Region Northwest, signed and delivered a memorandum to MU-Eleven, informing it that MU-Eleven would be relocated to Imperial Beach, California. Dkt. 24-4.[1] The memorandum further informed the commander of MU-Eleven that "on April 8, 2009 your command conducted its last underwater demolition training event in Puget Sound. . . . [and] no future training will be conducted on [ranges in Puget Sound] until the Record of Decision for the Northwest Training Range Environmental Impact Statement is issued, or the Navy is able to demonstrate compliance with NEPA and the ESA through other means." *Id*.

---

[1] According to the Navy, relocating MU-Eleven to California will relieve stress on EOD personnel by reducing time away from home during training, reduce training costs, reduce costs of relocating personnel, and would locate MU-Eleven with its EOD Operational Support Unit. Dkt. 24-3. In addition, the decision to relocate the unit was based in part on a plan called the Total Force Revision, developed by the Navy EOD community in November 2006. Dkt. 24-5 at 5. The purpose of this plan was to (1) consolidate all EODMUs at two locations, one in California and one in Virginia, (2) consolidate all EOD pre-deployment training into a "single 12-week pipeline," and (3) save money by consolidating facilities, training, and logistics functions. *Id*.

ORDER - 6

According to Commander ("CDR") Joseph DiGuardo, Jr., commanding officer of MU-Eleven, although MU-Eleven unit personnel "may still have some physical presence at Naval Air Station Whidbey Island, Washington, until some time in 2010, [MU-Eleven is] no longer conducting EOD training in the Northwest" and the last EOD training event in Puget Sound took place on April 8, 2009. Dkt. 24-5, 5-6. CDR DiGuardo stated that two MU-Eleven platoons will conduct the EOD training that had been scheduled for June and July 2009 in California rather than Puget Sound. *Id*. at 6.

CDR DiGuardo also stated that while MU-Eleven has "performed its final EOD training event in Puget Sound," shore detachments will remain in the Northwest Training Range Complex ("NWTRC"). *Id*. The detachment units are not scheduled to conduct any EOD underwater training events for the remainder of 2009, and "no events have been scheduled for 2010."[2] *Id*. However, Defendants maintain that while no EOD training events are currently planned, training could conceivably take place before issuance of a record of decision, though such an occurrence is "highly unlikely." Dkt. 27 at 14 (Defendants' reply).

During a telephonic hearing held May 14, 2009, the Court instructed the Navy to provide advance notice to PEER in the event the Navy planned to conduct EOD exercises. On May 19, 2009, Defendants wrote a letter promising PEER that the Navy agreed to

> provide reasonable, advance notice to PEER in the unlikely event that it becomes necessary for the Navy to perform further [EOD] underwater detonation training in Puget Sound before completion of the NEPA and ESA processes and associated compliance documents for such training. . . . The Navy will continue to provide such notice for the duration of the current lawsuit. In the unlikely event that the date of the EOD underwater detonation

---

[2] According to the Navy, training schedules for MU-Eleven and the two shore detachments are typically prepared annually. Dkt. 24-5 at 4. The training schedules are validated on a quarterly basis "based on the anticipated deployment schedules of the platoons being trained," and taking into account "major troop surges and anticipated operational needs during deployment." *Id*. Projected schedules are also "subject to change due to unforeseen circumstances and changes in operational requirements or commitments." *Id*. at 5.

ORDER - 7

training activity would be classified, we would inform you of the general time frame within which the exercise would be conducted.

Dkt. 27-2.

## B. NAVY'S NEPA ACTIVITIES

On October 8, 2002, PEER wrote the Navy, asking whether the Navy had made any NEPA determinations concerning EOD training exercises. On December 18, 2002, the Navy responded, and stated that "the potential impact on the environment from EOD in-water training warrants conducting NEPA." Dkt. 26 at 11 (*citing* NAV 005138, Doc. 119, p.2). The Navy initially chose to prepare an environmental assessment rather than an environmental impact statement.

PEER summarizes the Navy's NEPA activities as follows:

> The Navy characterized its intention in the NEPA process as "provid[ing] the proper environmental compliance documents without negatively affecting necessary EOD training operations." The Navy decided to meet this goal by characterizing the proposed action for the EA not as the EOD training itself, but as the implementation of the "Endangered Species Protection Plan" ("ESPP") which it was proposing as mitigation in connection with its ongoing ESA consultations with FWS and NMFS. Navy officials noted that: ["]The advantage of this approach is to avoid jeopardizing EOD training in Puget Sound with the EA required No Action alternative. Therefore, the No Action alternative will be to continue the EOD program without implementing the ESPP.["] The Navy recognized the doubtful legality of this approach, stating that the proposed action was "not in the standard NEPA approach" and "[w]hether this approach is acceptable to reviewing agencies remains to be seen." The Navy selected alternatives to consider in the EA which it had already determined were logistically and financially infeasible and/or did not meet Navy training requirements. The contractor delivered a final draft of the EA on August 18, 2004.
>
> The Navy never finalized the draft EA, and later decided to include evaluation of EOD training operations in Puget Sound in the overall NWTRC EIS. The Navy has continued EOD training exercises throughout its NEPA reviews. In August 2008, after this suit was originally filed, Navy personnel considered finalizing the 2004 EA in order to meet Plaintiffs' NEPA challenge. In response, John Mosher, with Navy Environmental, stated that: ["]The draft EA definitely had some shortcomings as it focused on the Endangered Species Protection Plan and not on the EOD operations themselves. At the time the EA was discontinued and the EIS was kicking in, it was felt that [finding of no significant impact, or FONSI] may not be possible (the agencies were using pretty strong language.) He stated that even if the NMFS and FWS [biological opinions] now supported FONSI, it would not be possible to quickly take the draft EA to final, as major revisions would be needed, and other issues including tribal concerns and additional species being listed under the ESA would have to be considered.

ORDER - 8

Dkt. 26 at 12 (Plaintiffs' response) (Plaintiffs' numbering of statements and citations to record omitted).

On July 31, 2007, the Navy initiated the scoping process for the preparation of an EIS for its activities in the NWTRC, including its EOD training exercises. Dkt. 24 at 10 (*citing* Notice of Intent to Prepare EIS, 72 Fed. Reg. 41712 (July 31, 2007)). This EIS notes that MU-Eleven will relocate to California, and that two shore detachments will remain in the NWTRC and will conduct up to four exercises per year. *Id*. The Navy maintains that in conjunction with the ongoing NEPA process, it is engaged in further ESA consultation with FWS and NMFS regarding training activities that will occur in the NWTRC after December 31, 2009. *Id*. at 11. The Navy maintains that it expects that the NWTRC Final EIS will be completed by the end of 2009, and that the Navy will subsequently issue an ROD for its training activities in the NWTRC. *Id*.

The Navy continued EOD training exercises throughout its NEPA process, until it ceased training exercises in April 2009.

**C.     NAVY'S ESA CONSULTATIONS**

In 1999, NMFS listed two salmon species as threatened under the ESA. On December 28, 2000, the Navy prepared a Biological Assessment, which noted that several listed species inhabited the area. The Navy requested concurrence from NMFS and FWS with the Navy's determination that EOD training exercises were not likely to adversely affect certain protected species. NMFS and FWS did not adopt the Navy's determination, thereby requiring the Navy to undergo formal consultation.

On June 30, 2008, NMFS issued a biological opinion. NMFS concluded that the EOD exercises were not likely to jeopardize the continued existence of the Puget Sound Chinook salmon, Hood Canal summer-run chum salmon, Puget Sound steelhead, or southern resident killer whales. Dkt. 18-2. The biological opinion included an ITS authorizing incidental take during EOD training exercises in Puget Sound. Dkt. 18-3. On September 16, 2008, NMFS wrote the Navy a letter in response to a request for

consultation. NMFS concluded that the EOD exercises were not likely to adversely affect Stellar sea lions or humpback whales. *Id*.

On November 7, 2008, FWS issued a biological opinion, concluding that the Navy's EOD training was not likely to jeopardize the continued existence of marbled murrelet and bull trout. Dkt. 18-4. The FWS biological opinion included an ITS authorizing incidental take during EOD training exercises. *Id*.

During the time consultation took place between the Navy, NMFS, and FWS, the Navy's EOD training exercises continued.

On July 28, 2008, PEER sent a 60-day notice of intent to sue to the Navy, NMFS, and FWS. Dkt. 4-2 (Exhibit 3). PEER notified Defendants of its allegations that the Navy was violating ESA Section 7(a)(2) by conducting EOD training exercises without having first completed consultation, and that the Navy was violating ESA Section 9(a) by taking listed species without an ITS. *Id*. at 12.

### III. PLAINTIFFS' LAWSUIT

On September 16, 2008, PEER filed a complaint. Dkt. 1. On October 24, 2008, PEER filed an amended complaint. Dkt. 4. PEER asserts five claims against Defendants: (1) the Navy is in violation of NEPA for failing to conduct any of the required analyses for its EOD training exercises; (2) the Navy is in violation of section 7 of ESA, 16 U.S.C. § 1536, for failing to ensure, in consultation with FWS and NMFS, that its EOD training exercises are not likely to jeopardize the continued existence of protected species; (3) the Navy is in violation of section 9 of ESA, 16 U.S.C. § 1538, for continuing to "take" protected species without a valid incidental take statement; (4) FWS and NMFS have unlawfully withheld agency action[3]; and (5) certain final agency actions taken by NMFS regarding EOD training exercises are arbitrary, capricious, an abuse of discretion, are not in accordance with law, and are reviewable under the APA, 5 U.S.C. § 706. Dkt. 4. PEER

---

[3] Plaintiffs concede that Count 4 is now moot. Dkt. 26 at 3 (Plaintiffs' response). Accordingly, this claim is dismissed.

ORDER - 10

moves the Court to issue an injunction prohibiting EOD training exercises until the Navy complies with NEPA and ESA, as well as a declaratory judgment that the Navy has violated the requirements of the statutes cited in Counts 1 through 5. *Id.*, 21-23. PEER also moves for an award of reasonable litigation expenses as allowed by the Equal Access to Justice Act, 28 U.S.C. §§ 2412, *et seq. Id.* at 23.

On May 7, 2009, Defendants filed a motion to dismiss. Dkt. 24. Defendants maintain that "the Navy's decision to cease all EOD underwater training exercises within the NWTRC until the completion of subsequent NEPA and ESA processes removes the bases for PEER's claims and, therefore, the case should be dismissed as moot." *Id.* at 14. Defendants further maintain that Counts 2-4 should be dismissed because "superceding ESA documents have already issued which moot PEER's claims, PEER did not provide the requisite notice of certain alleged ESA violations 60 days in advance of filing suit, and PEER has failed to state a viable ESA § 9 claim against the Navy." *Id.*

On May 26, 2009, Plaintiffs filed a response, opposing Defendants' motion to dismiss Counts 1, 2, 3, and 5. Dkt. 26. First, Plaintiffs contend that Defendants cannot meet their burden of demonstrating "that the Navy's supposed voluntary cessation of illegal conduct moots the case." *Id.* at 3. Second, Plaintiffs maintain that "Defendants' argument that PEER failed to provide adequate notice of its intent to pursue counts 2 and 3 is misguided and conflates the two distinct legal obligations imposed by section 7(a)(2) of ESA, 16 U.S.C. § 1538." *Id.* Third, Plaintiffs maintain that its claim alleging the Navy violated Section 9 of the ESA, 16 U.S.C. § 1538, states a cognizable claim because there is not an incidental take statement for all the protected species potentially harmed, and Plaintiffs' challenge extends to the NMFS incidental take statement. *Id.*

On May 29, 2009, Defendants filed a reply. Dkt. 27. On June 18, 2009, the Court granted PEER leave to file a surreply. Dkt. 30; Dkt. 31 (Plaintiffs' surreply).

**IV. DISCUSSION**

**A. LEGAL STANDARDS**

**1. Motion to Dismiss under Rule 12(b)(1)**

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(1) if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v. Tinnerman*, 626 F. Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal question jurisdiction) *and* 1346 (United States as a defendant). When considering a motion to dismiss pursuant to Rule 12(b)(1), the court is not restricted to the face of the pleadings, but may review any evidence to resolve factual disputes concerning the existence of jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), cert. denied, 489 U.S. 1052 (1989); *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

**2. Motion to Dismiss under Rule 12(b)(6)**

Rule 12(b)(6) motions to dismiss may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Material allegations are taken as admitted and the complaint is construed in the plaintiff's favor. *Keniston v. Roberts*, 717 F.2d 1295 (9th Cir. 1983). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the

speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965. Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

### 3. Standard for Mootness

A case becomes moot whenever it loses "its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (*quoting Hall v. Beals*, 396 U.S. 45, 48 (1969)). However, a defendant's voluntary cessation of allegedly wrongful behavior does not make a case moot unless events make "absolutely clear" that the challenged activities cannot reasonably be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc*., 528 U.S. 167, 193 (2000), *see also City News & Novelty v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) ("Mootness doctrine . . . protects plaintiffs from defendants who seek to evade sanction by predictable 'protestations of repentance and reform.'") (citation omitted).

In the Ninth Circuit, defendants in NEPA cases face "a particularly heavy burden in establishing mootness." *Cantrell*, 241 F.3d at 678. A NEPA defendant does not necessarily establish mootness simply by demonstrating that the challenged project has been completed or that the challenged act has ceased. *See id*. If that were case, a NEPA defendant "could merely ignore the requirements of NEPA" and complete the challenged project or act and then "hide behind the mootness doctrine." *See id*. In deciding whether a claim has become moot, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." *Id*. (citation omitted). Similarly, when a plaintiff seeks declaratory relief, the question is whether any "meaningful relief" is available. *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007).

### 4. Stay

A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and

ORDER - 13

> effort for itself, for counsel, and for litigants. The exertion of this power calls for the exercise of a sound discretion. Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*CMAX, Inc. v. Hall*, 300 F.2d 235, 268 (9th Cir. 1962).

A district court may stay proceedings pending resolution of independent proceedings which bear upon the case, whether those proceedings are judicial, administrative, or arbitral in character. *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). This rule does not require that the issues in such proceedings are necessarily controlling on the action before the court. *Id.*

**B.  PEER'S CLAIMS**

Defendants maintain that PEER's claims are moot because PEER cannot point to any potential injury that could occur, and argue that the potential for environmental damage alleged by PEER no longer exists because EOD training exercises have been halted pending further review. Defendants further maintain that the alleged procedural harms no longer exist because the Navy has issued a draft EIS for the NWTRC and requested comments from the public on the analyses in the draft EIS. Therefore, Defendants argue, PEER's allegations of harm due to the alleged failure of the Navy to provide information to PEER and to involve the public in the NEPA process are no longer factually accurate. Finally, Defendants contend that no effective relief is available to PEER, and that no exceptions to the mootness doctrine apply.

PEER counters that the Navy's own assurances that it will not resume EOD training does not make it "absolutely clear" that the training events will not recur, especially because Defendants have never admitted that the training events occurred in violation of NEPA and ESA. In addition, PEER contends that the Navy's claim that the alleged wrongful conduct is not likely to recur is undermined by at least two additional

factors: (1) the Navy has admitted that the move of MU-Eleven is not complete and that shore detachments will remain in the NWTRC region, and (2) the Navy has not provided evidence of NEPA or ESA complaince for EOD training activities that are planned to occur in the San Diego area after MU-Eleven is transferred.

Finally, PEER contends that its claims are not moot because, even assuming the training activities have ceased, effective relief is still available. Specifically, PEER maintains that the Navy previously agreed to restoration activities to enhance salmonoid and forage fish production around Crescent Harbor, Whidbey Island, by restoring a former salt marsh and intertidal beach habitat, as mitigation for the damage EOD training does to those fish populations. PEER argues that these activities, along with other mitigation measures may be appropriate to remedy harm caused by past EOD training exercises.

In addition to its argument that PEER's claims are moot, Defendants alternatively move the Court to stay the proceedings pending the issuance of the NWTRC record of decision:

> A stay is appropriate because the exercises challenged in [PEER's first amended complaint] are no longer occurring, and no future exercises are planned. Moreover, pursuant to the Court's instructions during the May 14, 2009 hearing, the Navy has committed to notifying PEER in the highly unlikely event that a training exercise is scheduled in Puget Sound prior to the issuance of the ROD. . . . Therefore, PEER will have an opportunity to seek relief if an exercise is scheduled to occur before the completion of further NEPA and ESA processes. In these circumstances, the interests of judicial economy would not be served and the resources of the parties and the court would not be well spent by litigating the legality of historical exercises or unplanned future exercises, which will be covered by new environmental compliance documents.

Dkt. 27 at 14.

PEER opposes a stay. First, PEER argues that the Court should not consider Defendants' alternative request for a stay because Defendants did not raise this issue in their motion to dismiss. Second, PEER argues that granting a stay "would totally eviscerate the exception to mootness for voluntary cessation" by allowing Defendants to receive "essentially the same relief as if the case was moot despite the fact that the

voluntary cessation doctrine would direct that the case be decided on the merits." Dkt. 31 at 4 (PEER's surreply). PEER further maintains that it is entitled to the Court's determination concerning the Navy's legal obligations under NEPA and ESA, "and a court order preventing future illegal activity." *Id*. at 5. Finally, PEER contends that Defendants have not met their burden in demonstrating that a stay is warranted. PEER maintains that it would be prejudiced by a stay because it would be denied timely resolution of its claims.

Without reaching the issue of whether Defendants have met their burden in demonstrating mootness as to any of PEER's claims, the Court concludes that this action should be stayed pending the Navy's completion of the NEPA processes and renewed ESA consultation. Addressing the Navy's mootness arguments is not proper because the Navy has indicated that it may resume training after completing the NEPA and ESA processes, and possibly, though unlikely, before completion. Staying this case will also alleviate PEER's concerns that the Navy is "hiding behind" the mootness doctrine by ceasing the EOD exercises, only to return to the challenged activities once this case is dismissed.[4]

This case should be stayed because it would be premature to consider PEER's claims for injunctive relief. For purposes of issuing a stay, Defendants have sufficiently demonstrated that it is unlikely that the challenged training events will recur before the Navy has completed the NEPA process and renewed ESA consultations. Navy command

---

[4] Assuming, *arguendo*, that it was "absolutely clear" that the Navy's training exercises cannot reasonably be expected to recur, the Court should still reserve ruling as to whether any "effective relief is available." For example, as PEER argues, the current NMFS biological opinion requires the Navy to conduct certain marsh restoration projects. Defendants state that the Navy intends to comply with this requirement, but only "as long as [the current NMFS biological opinion] is in effect." Dkt. 27 at 8 n. 5. Even if completion of the Navy's NEPA process and ESA consultation renders PEER's *current* requested injunctive and declaratory relief moot, the Court finds it appropriate to stay the determination of whether any effective relief (such as marsh restoration) is available until after the Navy has completed these processes. *See Gordon*, *infra* at 15 n. 5. It would be premature to address this issue, as remedial issues for past or future harms may be addressed during these environmental review processes.

ORDER - 16

has ordered these training exercises halted pending completion of the NEPA and ESA processes, and no EOD exercises are scheduled for the remainder of 2009 or for 2010. In addition, MU-Eleven, the training unit which conducted the majority of the EOD exercises in Puget Sound, is in the process of being relocated to California. While PEER argues that MU-Eleven personnel remain in the Puget Sound area, the Court notes that the MU-Eleven held, or intends to hold, its scheduled June and July 2009 training in California rather than Puget Sound. Finally, per this Court's instructions, the Navy has promised to provide advance notice to PEER in the "unlikely" event the Navy conducts EOD exercises before completion of the NEPA and ESA processes. Such notice would afford PEER the opportunity to move to lift the stay, and file a motion for temporary restraining order or preliminary injunction.

It would also be premature to consider PEER's claims for declaratory relief. At this time, the Court could not adequately determine the Navy's legal obligations because the Navy is currently engaged in the NEPA process and renewed ESA consultation. The decision to move MU-Eleven may result in significantly reduced training operations in Puget Sound, which may in turn alter the impact of the training on the environment and natural resources. It also would not be proper to address PEER's claims for declaratory relief based on past NEPA violations. *See Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1283-84 (9th Cir. 1973) (a judgment declaring past noncompliance with NEPA would serve no practical purpose).[5]

PEER also raises objections to the "yet-complete" NEPA process in its response. Dkt. 26, 17-18. However, these issues are not yet ripe for judicial review. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998). Because the Navy has halted

---

[5] In their reply, Defendants maintain that the ESA citizen suit provision does not permit declaratory relief for PEER's ESA claims. Dkt. 27 at 7 n. 4 (*citing Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 804 (9th Cir. 2009)) ("The ESA allows a citizen suit for the purpose of obtaining injunctive relief only."). PEER did not have an opportunity to address this argument, but may do so after the stay is lifted.

ORDER - 17

EOD operations pending the completion of the environmental review processes, delayed judicial intervention would not cause PEER significant hardship. *Id.* at 733. In addition, because the Navy has not yet issued its ROD, the Court concludes that it is premature to intervene because the Navy could conceivably make changes to the draft EIS and address PEER's concerns. After the Navy has completed the NEPA and ESA processes, PEER may choose to pursue its claims against Defendants.

With regard to the Navy's future EOD operations in California, PEER has not demonstrated that it has standing to challenge the Navy's California operations, or that venue would be proper in this Court.

The Court recognizes PEER's concerns that granting a stay prejudices PEER by depriving it of timely resolution of its claims. The Court also agrees that the Navy would not endure undue hardship if this action was not stayed. However, the Court concludes that the interests of the orderly course of justice and judicial economy outweigh any prejudice to PEER. *See CMAX*, *supra*. In light of the Navy's ceasing of EOD training events, its relocating of MU-Eleven to California, and its continuation of the NEPA process and initiation of renewed ESA consultations, the Court concludes that the NEPA and ESA processes may significantly bear upon this case. In addition, PEER has not identified any immediate need for remediation; therefore, staying the determination of whether PEER is entitled to any relief will not cause it undue prejudice.

The Court also recognizes PEER's concern that staying this case could "eviscerate the exception" to the mootness doctrine by allowing Defendants to obtain the same relief as if the case were determined moot. However, the Court is not granting Defendants an indefinite stay; rather, this case is stayed until February 1, 2010, to permit Defendants time to complete their environmental review processes.

Finally, the Court concludes that a stay is proper despite the fact that Defendants should have included their alternative request for a stay in their motion, rather than raising this request for the first time in their reply. PEER was afforded the opportunity to

address this issue, as the Court considered its surrpely. Additionally, the Court may stay a case *sua sponte* if appropriate.

Accordingly, PEER's claims in Counts 1, 2, 3, and 5 are stayed until February 1, 2010.[6] The Navy indicated that it intends to complete NEPA review by the end of 2009, and issue a record of decision 30 days after completion of the review. The parties may move the Court to extend or shorten the date for lifting the stay as circumstances warrant.

**C.      NOTICE OF RESUMPTION OF EOD TRAINING EXERCISES**

The Court is issuing this stay in significant part because of the Navy's representations that it does not intend to conduct EOD training exercises in the NWTRC until completion of the environmental review processes, and that if it is necessary to resume the exercises, it will not proceed without providing adequate advance notice to PEER. Accordingly, the Navy is ordered to provide such notice in the event it intends to resume EOD training exercises in the NWTRC region to allow PEER time to apply to the Court for injunctive relief before such training operations will be undertaken.

---

[6] Defendants maintain that Count 2 is moot because the Navy has now completed ESA Section 7 consultation. Defendants further maintain that PEER's allegation that the Navy violated Section 7 by relying on an "inadequate" biological opinion because PEER failed to include this allegation in its 60-day notice. PEER acknowledges the Navy's completion of its consultation duties, but maintains that Defendants misconstrue the other allegation included in Count 2. PEER maintains that it is not alleging that the Navy violated ESA by relying on an inadequate biological opinion. Rather, PEER maintains that the Navy continues to fail to implement adequate mitigation measures to ensure that EOD training exercises will not jeopardize continued existence of protected species – "only now those inadequate measures are embodied in the NMFS BiOp." The Court concludes that Count 2 should be stayed in light of the Navy's representations that it is now engaged in renewed ESA consultations. The Court will also reserve ruling on Defendants' argument that PEER failed to raise the "inadequate mitigation measures" argument in its 60-day notice. However, the Court notes that, in the event any of PEER's claims are later found to no longer present a "live controversy," the Court must determine whether any meaningful relief is available. Under such circumstances, PEER would not be required "to have asked for the precise form of relief that the district court may ultimately grant." *Nw. Env. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988).

The Court further notes that Count 3 is stayed because the Navy is engaged in further ESA consultations. As a result, it is not clear that the Navy will be operating under the current ITS during future training exercises. In addition, PEER may seek to again challenge the consulting agencies' issuance of the biological opinions and incidental take statements.

ORDER - 19

## V. ORDER

Therefore, it is hereby **ORDERED** that

Defendant's motion to dismiss (Dkt. 24) is **GRANTED in part**, and Plaintiffs' claim in Count 4, that FWS and NMFS have unlawfully withheld agency action, is **DISMISSED**.

It is further **ORDERED** that the remainder of this action is **STAYED** until February 1, 2010. Plaintiffs and Defendants are ordered to file a status report with the Court on or before February 1, 2010.

It is further **ORDERED** that the Navy provide reasonable, advance notice to Plaintiffs in the event the Navy intends to resume EOD training exercises.

DATED this 17th day of July, 2009.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 20